# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| POPE RESOURCES LP, a Delaware limited partnership, | ) ) ) | No. 80032-9-I |
| Respondent, | ) ) | |
| v. | ) ) | |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON; CERTAIN LONDON MARKET COMPANIES; CONTINENTAL CASUALTY COMPANY; and THE CONTINENTAL INSURANCE COMPANY (as successor in interest to the rights and obligations under certain policies issued by HARBOR INSURANCE COMPANY); AMERICAN REINSURANCE COMPANY; ASSOCIATED INTERNATIONAL INSURANCE COMPANY; CENTRAL NATIONAL INSURANCE COMPANY; CENTURY INDEMNITY COMPANY; EMPLOYERS INSURANCE COMPANY OF WAUSAU; EMPLOYERS REINSURANCE COMPANY; GRANITE STATE INSURANCE COMPANY; HIGHLANDS INSURANCE COMPANY; INSURANCE COMPANY OF NORTH AMERICA; INSURANCE COMPANY OF THE STATE OF PENNSLYVANIA; INTERNATIONAL INSURANCE COMPANY as successor to INTERNATIONAL SURPLUS LINES INSURANCE COMPANY; NEW HAMPSHIRE INSURANCE COMPANY; and NORTHBROOK INSURANCE COMPANY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | PUBLISHED OPINION |
| Appellants. | ) | |

POPE & TALBOT, INC.;                       )
GENERAL INSURANCE COMPANY      )
OF AMERICA; LIBERTY MUTUAL        )
INSURANCE COMPANY; and JOHN     )
DOES 1-20,                                       )
                                                       )
                            Defendants.            )
_____)

VERELLEN, J. — Washington's broad and inclusive anti-annulment statute, RCW 48.18.320, voids any agreement between an insurer and insured attempting to retroactively cancel, rescind, void, buy back, or otherwise annul an insurance contract for liability coverage after a potentially covered injury or damage to a third party has occurred. When analyzing whether a particular settlement agreement and release implicates an "insurance contract," we must consider whether the substance of the agreement and release impacts a risk-shifting and risk-distributing device, not necessarily an entire policy.

Applying recognized conflict of law principles, we conclude Washington's paramount interest in environmental cleanup and pollution remediation requires we apply RCW 48.18.320 to each of the settlement and remediation agreements between ten different Insurers and Pope & Talbot, Inc., the previous owner and operator of the Port Gamble Bay and mill site located in Washington. We further conclude that RCW 48.18.320 renders all ten agreements unenforceable.

Therefore, we affirm.

2

FACTS

The history underlying the current dispute is extensive. In 1853, Pope & Talbot, Inc. began operating a mill in Port Gamble, Washington. In 1964, Pope & Talbot, which had become a publicly traded Delaware corporation, moved its headquarters to Oregon.

Between 1959 and 1986, various insurance companies issued comprehensive general liability insurance policies to Pope & Talbot. Over the years, Pope & Talbot also obtained various excess and umbrella coverages.[1]

Here, we are concerned with the policies issued by TIG Insurance Company,[2] Evanston Insurance Company,[3] Westport Insurance Corporation,[4] London Market Insurers,[5] Munich Reinsurance America Inc.,[6] Century

---

[1] A primary comprehensive general liability policy provides an insured with "the first line of defense in the event of accident or injury." Safeco Ins. Co. of Ill. v. Auto. Club Ins. Co., 108 Wn. App. 468, 479, 31 P.3d 52 (2001). Excess and umbrella policies provide coverage only after the primary policy has been exhausted and "protect the insured in the event of a catastrophic loss in which liability damages exceed available primary coverage." Id. at 479-80 (citing 15 LEE R. RUSS & THOMAS F. SAGALLA, COUCH ON INSURANCE 3D § 220:32 (3d ed. 2000)).

[2] TIG Insurance Company is the successor insurer to International Surplus Lines Insurance Company. Clerk's Papers (CP) at 10855-58.

[3] Evanston Insurance Company is the successor insurer to Associated International Insurance Company. CP at 10860-62.

[4] Westport Insurance Corporation is the successor insurer to Employers Reinsurance Corporation. CP at 4835, 4856.

[5] Certain Underwriters at Lloyd's London and Certain Market Insurance Companies (London Market) issued their policies to Pope & Talbot. CP at 10737-814.

[6] Munich Reinsurance America Inc. was previously named American Reinsurance Company. CP at 6068, 6070, 10730-33.

Indemnity Company,[7] Employers Insurance Company of Wausau,[8] Allstate

Insurance Company,[9] Continental Insurance Company,[10] and Granite State

Insurance Company [11] (Insurers).

In 1985, Pope & Talbot created Pope Resources, a limited partnership.[12]

Pope & Talbot transferred all of its Washington real property, including the Port

Gamble Bay and mill site, to Pope Resources.[13] In exchange, Pope Resources

assumed upwards of $22 million of Pope & Talbot's debt. Pope Resources

leased the mill site back to Pope & Talbot, which continued to operate the mill

until 1995, when it was shut down due to significant environmental

---

[7] Century Indemnity Company is the successor insurer to Insurance Company of North America. CP at 2765-68, 10709-15.

[8] Employers Insurance Company of Wausau is the successor insurer to Employers Mutual Liability Insurance Company of Wisconsin. CP at 10863-909.

[9] Allstate Insurance Company is the successor insurer to Northbrook Insurance Company. CP at 3994-4058, 10694-701.

[10] Continental Insurance Company is the successor insurer to Harbor Insurance Company. CP at 3144-48, 3156-62, 10706-708.

[11] Granite State Insurance Company, the Insurance Company of the State of Pennsylvania, and the New Hampshire Insurance Company are affiliated with American Insurance Group. CP at 6817-22, 10815-54.

[12] "Pope Resources . . . has independent management and is largely a timber operator/owner and real estate . . . company. Pope & Talbot maintained all of the operating manufacturing assets and did not own any timberland after that spinoff. They were separate companies." CP at 2511.

[13] "The Company hereby conveys, assigns, transfers, sets over and delivers, as is and without representations or warranties except as expressly set forth herein, to the Partnership all of the Company's right, title, and interest in and to the Properties [including] the Timber Properties." CP at 8820. The "Port Gamble Bay and Mill Site consists of the Property together with the former sawmill area, and uplands areas to the west and south of the former sawmill area." CP at 626.

contamination.  The Washington State Department of Ecology listed the Port Gamble mill as a hazardous waste site.  The estimated cost to clean up Port Gamble, including the mill site, is $22 million.[14]

In June of 1995, Pope Resources and Pope & Talbot started communicating about their shared responsibility for the environmental contamination at Port Gamble.

In 1997, Pope Resources sent Pope & Talbot a formal demand letter.  A few years later, Pope Resources and Pope & Talbot entered into a remediation agreement.  In summary, Pope & Talbot assumed responsibility for the cleanup at Port Gamble and, once completed, Pope Resources would clean up the other sites contaminated by Pope & Talbot's operations.

Around the same time, Pope & Talbot filed suit against Insurers in King County Superior Court seeking insurance coverage for its Washington liabilities. Between 1998 and 2003, Pope & Talbot and Insurers entered into ten separate settlement and remediation agreements.

In November 2007, Pope & Talbot filed for Chapter 11 bankruptcy in Delaware and stopped all remediation work at Port Gamble.  The bankruptcy was converted to a Chapter 7 proceeding.

On February 4, 2013, the bankruptcy court granted Pope Resources relief from the automatic stay to enable Pope Resources "to liquidate its claims

---

[14] CP at 14718.

against [Pope & Talbot] for contamination arising from [Pope & Talbot's] ownership or operation of the property."[15]

In 2015, Pope Resources filed suit in King County to obtain coverage for its environmental liabilities against its own insurers, seeking declaratory judgment for breach of contract, bad faith, and violations of the Consumer Protection Act. In 2016, Pope Resources amended its complaint to seek contribution from Pope & Talbot and Insurers for the costs of the environmental remediation.

The court entered a case management order phasing the litigation. Pope Resources and Insurers filed cross motions for summary judgment regarding conflicts of law and the enforceability of the settlement agreements.

On April 30, 2019, the court denied Insurers' motion for summary judgment and granted Pope Resources' motion for summary judgment. The trial court noted that no conflict of law analysis was necessary because Pope Resources was "not a signatory or [a] party to [the] settlement agreements."[16] The court concluded, "Allowing the settlement agreements to be used as a shield . . . against a third party, non-signatory, to retroactively cancel insurance coverage of a potentially covered event, would be to enforce a contract that is illegal as violative of Washington public policy."[17] Accordingly, the court held that all ten settlement agreements were unenforceable.

---

[15] CP at 60.

[16] CP at 15794.

[17] CP at 15794-95.

Insurers filed motions for discretionary review in this court.[18] Commissioner Mary Neel granted the motions for discretionary review as to the conflict of law issue and interpretation of Washington's anti-annulment statute.[19]

Subsequent phases of this litigation will determine whether Pope Resources has compensable damages and is entitled to a judgment against Pope & Talbot and Insurers.

ANALYSIS

At the outset, we emphasize the very narrow issues before this court. Commissioner Neel granted discretionary review of the conflict of law "threshold issue" and the "interpretation and application" of Washington's anti-annulment statute, RCW 48.18.320, as it pertains to the claims involving the Port Gamble Bay and mill site.[20]

We are not deciding other issues nor are we deciding any conflict of law as it may pertain to any other issues.[21] We are focused on how the particular language of the ten settlement and remediation agreements between Pope & Talbot and Insurers impact the potential claims of Pope Resources, a

---

[18] Westport, Allstate, Granite State, Munich, Evanston, and TIG sought review of the trial court order entered on April 30, 2019. London Market, Century, Wausau, and Continental sought review of both the April 30, 2019, order and the summary judgment order entered on March 11, 2019.

[19] We decline to reach the capacity to be sued issue that Commissioner Neel allowed the parties to brief but was not a ground for discretionary review.

[20] CP at 16094.

[21] "[D]ifferent issues in a single case arising out of a common nucleus of facts may be decided according to the substantive law of different states," sometimes referred to as depecage. FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc., 175 Wn. App. 840, 857 n.15, 309 P.3d 555 (2013).

prospective garnishor of the insurance contracts that was known to the Insurers as the current owner of the Port Gamble mill site when all 10 settlement agreements were entered into.

I.  Conflict of Law

Insurers contend that the trial court failed to engage in the appropriate conflict of law analysis before determining whether RCW 48.18.320 applied to the ten settlement agreements.

We disagree with the trial court's conclusion that no conflict of law analysis was required because Pope Resources was not a signatory or a party to any of the settlement agreements.  Whether the settlement agreements are valid impacts the prospective claims of Pope Resources.  Because Pope Resources has a potential interest in the outcome of the dispute, a conflict of law analysis is required.  To determine whether RCW 48.18.320 applies to the settlement agreements, we must first engage in a conflict of law analysis to decide which state's law applies.  We review the question of conflict of law de novo.[22]

Actual conflict.  The first step in the conflict of law analysis is to determine whether an actual conflict exists.[23]  An actual conflict exists if the

---

[22] Shanghai Com. Bank Ltd. v. Kung Da Chang, 189 Wn.2d 474, 479-80, 404 P.3d 62 (2017); Erwin v. Cotter Health Ctrs., 161 Wn.2d 676, 691, 167 P.3d 1112 (2007).

[23] Freestone Cap. Partners L.P. v. MKA Real Est. Opportunity Fund I, LLC, 155 Wn. App. 643, 664, 230 P.3d 625 (2010); see also Shanghai Com. Bank, 189 Wn.2d at 480-81; Erwin, 161 Wn.2d at 692.

outcome of an issue is different depending on which state's law applies.[24]
Here, there is an actual conflict.

Insurers contend an actual conflict exists because the enforceability of
the settlement agreements depends on whether Washington law applies. Pope
Resources argues that the result is the same under Washington law and the
common law of any other state because, similar to RCW 48.18.320, the
common law generally recognizes an insurer and insured should not be allowed
to enter into an agreement to annul insurance coverage after an injury has
occurred, leaving an injured third party with no recourse.[25] But Pope
Resources does not cite any authority supporting its contention that the
common law of other states provides the same level of protection to an injured
third party as does RCW 48.18.320.

Here, some Insurers argue that Oregon law should govern their
settlement agreements but did not contract for a specific state's law to apply.
Others specifically contracted for Oregon, California, or New Jersey law to
apply. Because Oregon, California, and New Jersey do not have anti-

_____

[24] Freestone Cap. Partners, 155 Wn. App. at 664 (quoting Seizer v. Sessions, 132 Wn.2d 642, 648, 940 P.2d 261 (1997)); Erwin, 161 Wn.2d at 692.

[25] See Finkelberg v. Cont'l Cas. Co., 126 Wash. 543, 549, 219 P. 12 (1923) (insurer and insured's cancellation of insurance policy after car accident occurred does not relieve the insurer from obligations under indemnity policy); STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS, & JORDAN R. PLITT, 2 COUCH ON INSURANCE § 31:49 (3d. ed. 1995) ("Where the contract of insurance provides for liability to third persons, the insurer and the insured cannot terminate such a contract by their voluntary action to the prejudice of a claimant's rights which have already vested.").

annulment statutes comparable to Washington's statute, the validity of each settlement agreement turns on which state's law applies. Therefore, there is an actual conflict.

Agreements with no choice of law provision. Once an actual conflict is established, the next step in the conflict of law analysis depends on whether the parties have contracted for a specific state's law to apply.

Washington applies section 188 of the Restatement (Second) of Conflicts of Law when an actual conflict exists and the parties have not contracted for a choice of law provision. Under section 188 subsection (2), the "most significant relationship test," a court will apply "[t]he local law of the state which, with respect to that issue, has the most significant relationship to the transaction and the parties."[26] In determining which state has the most significant relationship to the transaction, the factors to be considered are "(a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicile, residence, nationality, place of incorporation and place of business of the parties."[27]

We begin with Insurers that did not contract for a choice of law provision. Pope & Talbot's settlement agreements with Granite State, TIG, Evanston, and Wausau do not contain a choice of law provision, but the insurers contend that

---

[26] Canron, Inc. v. Fed. Ins. Co., 82 Wn. App. 480, 493, 918 P.2d 937 (1996).

[27] RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 188(2) (1971).

Oregon law applies. For these four Insurers, the tangle of these various factors is not conclusive; some factors favor the Insurers, some do not. Although inconclusive, we include a summary of the factors as to each Insurer:

(1) <u>Granite State.</u> Granite State, the Insurance Company of the State of Pennsylvania, and the New Hampshire Insurance Company are affiliated with American Insurance Group. Granite State contracted for its settlement agreement with Pope & Talbot in either Oregon or New York.[28] Pope & Talbot's president in Oregon and Granite State representatives in New York handled the final settlement negotiations.[29] Pope & Talbot's president signed the settlement agreement in Oregon, and Granite State's "authorized agent" signed the agreement in New York.[30] Granite State delivered the settlement check to Pope & Talbot in Oregon.[31] Pope & Talbot deposited the check in Oregon.[32] Granite State is domiciled in Pennsylvania and its principle place of business is in New York.[33] Pope & Talbot is incorporated in Delaware and is headquartered in Oregon.[34] The agreement released Granite State from liability resulting from Pope & Talbot's operations in Oregon and Washington.[35]

---

[28] CP at 3679, 3691.

[29] CP at 3692.

[30] CP at 2534-36.

[31] CP at 3695.

[32] CP at 3695.

[33] CP at 3698.

[34] CP at 8812.

[35] CP at 2537-38.

(2) TIG. TIG is the successor insurer to International Surplus Lines Insurance Company.[36] International is the insurer that entered into the settlement agreement with Pope & Talbot.[37] Pope & Talbot and International contracted for the settlement agreement in either Oregon or New Hampshire.[38] Pope & Talbot's representatives negotiated from Oregon, and International's "decision maker" participated in the negotiations from New Hampshire.[39] During negotiations, International was also represented by Washington counsel.[40] Negotiations occurred "either in Oregon or over the telephone and in writing between" Pope & Talbot's representatives in Oregon and International's representatives and counsel in Oregon, New Hampshire, and Washington.[41] Pope & Talbot accepted and executed the agreement in Oregon and International signed the agreement in New Hampshire.[42] International delivered the settlement check to Pope & Talbot in Oregon and Pope & Talbot deposited the check in Oregon.[43] Pope & Talbot is incorporated in Delaware and is headquartered in Oregon.[44] International is an Illinois corporation and is

---

[36] CP at 3680 n.2.

[37] CP at 3680-710.

[38] CP at 3691.

[39] CP at 3692-93.

[40] CP at 3692-93.

[41] CP at 3692-93.

[42] CP at 3691.

[43] CP at 3696.

[44] CP at 8812.

headquartered in New Hampshire.[45] The agreement released International from liability arising from Pope & Talbot's operations in Oregon and Washington.[46]

(3) <u>Evanston.</u> Evanston is the successor insurer to Associated International Insurance Company.[47] Associated International is the insurer that entered into the settlement agreement with Pope & Talbot.[48] Pope & Talbot contracted for the agreement with Associated International in either Oregon or California.[49] During negotiations, Pope & Talbot's counsel in Oregon negotiated with Associated International's counsel in Oregon and New York.[50] Pope & Talbot accepted and executed the agreement in Oregon, and Associated International signed the agreement in California.[51] Associated International delivered the settlement check to Pope & Talbot's counsel in Oregon, and Pope & Talbot deposited the check in Oregon.[52] Pope & Talbot is incorporated in Delaware and is headquartered in Oregon.[53] Associated International is a California corporation headquartered in California.[54] The

---

[45] CP at 3698.

[46] CP at 3002, 9049-52.

[47] CP at 3680 n.1.

[48] CP at 3680-710.

[49] CP at 3691.

[50] CP at 3693.

[51] CP at 3691.

[52] CP at 3696.

[53] CP at 8812.

[54] CP at 3698.

agreement released Associated International from liability arising from Pope & Talbot's operations in Oregon and Washington.[55]

(4) <u>Wausau.</u>  Wausau and Pope & Talbot contracted for the agreement in either Oregon or Illinois.[56]  Pope & Talbot's counsel and management in Oregon negotiated with Wausau's counsel in Oregon and Texas.[57]  During negotiations, some in-person meetings were held in Oregon.[58]  Pope & Talbot executed the agreement in Oregon, and Wausau signed the agreement in Illinois.[59]  Wausau wired the settlement amount to Pope & Talbot's bank in Oregon.[60]  Pope & Talbot is incorporated in Delaware and is headquartered in Oregon.[61]  Wausau is a Wisconsin company headquartered in Wisconsin.[62] The agreement released Wausau from liability arising from Pope & Talbot's operations in Oregon, Canada, and Washington.[63]

A variety of states were involved in aspects of negotiating, executing, and performing the settlement agreements.  On the surface, the mix of section 188 factors do not favor applying the law of any particular state.  But section 188 factors  "'are to be evaluated according to their relative importance with

---

[55] CP at 3059, 3063, 9049-52.

[56] CP at 3691.

[57] CP at 3692.

[58] CP at 3692.

[59] CP at 3691.

[60] CP at 12144.

[61] CP at 8812.

[62] CP at 3698.

[63] CP at 12132.

respect to the particular issue' and in conjunction with the principles set forth in [section] 6 of the Restatement."[64]  These principles include:

> (a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of the law to be applied.[65]

These principles "underlie all rules of choice of law" and are used to evaluate the significance of a relationship to the potentially interested states, the thing, and the parties with respect to the particular issue.[66]  Thus, we weigh the contacts with potentially interested states under the circumstances and in the context of relevant policy considerations to determine which state's laws applies.

Here, Washington has a significant interest in ensuring that a hazardous waste site located in Washington is remediated.  Specifically, Washington's Model Toxic Control Act provides:

> Each person has a fundamental and inalienable right to a healthful environment, and . . . has a responsibility to preserve and enhance that right.  The beneficial stewardship of the land,

---

[64] Canron, 82 Wn. App. at 493 (quoting RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 188(2) (1971)).

[65] RESTATEMENT (SECOND) CONFLICTS OF LAW § 6 (1971).  If the purposes of the state's law would be furthered by its application to the facts, this is a good reason for such an application to be made.  RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 6 cmt. e (1971).  The state with the dominant interest should have its law applied.  RESTATEMENT (SECOND) OF CONFLICTS LAW § 6 cmt. f (1971); see also Seizer, 132 Wn.2d at 652-53.

[66] RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 222, cmt. b (1971).

air, and waters of the state is a solemn obligation of the present generation for the benefit of future generations."[67]

And, as this court articulated in <u>Canron, Inc. v. Federal Insurance Company</u>, Washington has "a paramount interest" in protecting its residents from environmental contamination and promoting the "health and safety of its people."[68] Insurance can play a significant role in safeguarding that interest. Here, as in <u>Canron</u>, "[t]he existence or absence of insurance proceeds can determine whether or not a hazardous waste site is remediated. Washington, therefore, has a significant interest in [the] insurance coverage."[69]

Additionally, the comparative cost of cleanup at a particular location can impact the conflicts analysis.[70] Bridgewater Group, Inc. conducted an assessment of known and potential environmental liabilities associated with

---

[67] RCW 70A.305.010(1).

[68] 82 Wn. App. 480, 494, 918 P.2d 937 (1996). In <u>Canron</u>, a Canadian corporation based in Canada shipped byproducts containing zinc to Western Processing, a Kent, Washington facility, for recycling and disposal. <u>Id.</u> at 482-83. The Environmental Protection Agency closed the Kent facility and designated it a "Superfund site under the Comprehensive Environmental Response, Compensation, and Liability Act." <u>Id.</u> at 482. Canron's insurer denied coverage, and Canron sued. <u>Id.</u> at 483-84. Canron's insurer argued that Quebec law should govern the dispute because Quebec was the place where the contract was entered. <u>Id.</u> at 492-93. This court upheld the trial court's decision that Washington law applied to the dispute primarily because of Washington's interest in ensuring that the "hazardous waste site was remediated." <u>Id.</u> at 492-94.

[69] <u>Id.</u> at 494.

[70] See <u>Ingenco Holdings, LLC v. Ace Am. Ins. Co.</u>, 921 F.3d 803, 811 (9th Cir. 2019) (holding that Washington law applied in an environmental cleanup because the coverage amounts for a single site in Washington "dwarfed" the coverage amounts for the 12 sites located in Virginia.).

Pope & Talbot's operations"[71] and concluded that the environmental contamination occurring in Port Gamble was by far the most costly. Bridgewater predicted that the contamination resulting from Pope & Talbot's operations of the mill site was approximately $11 million and the total damage of its operations in Port Gamble would cost upwards of $22 million.[72] Estimated liability at Pope & Talbot's operations at several other sites in Washington was upwards of $21 million.[73] By contrast, its operations in St. Helens, Oregon, was approximately $12 million, and its operations at other sites in Oregon was estimated at $6 million.[74] Because the single most expensive cost of cleanup site is at Port Gamble, this also favors applying Washington rather than Oregon law.

Further, in adopting Washington's anti-annulment statute, the legislature intended "to ensure that cancellation of [an insurance contract would not] adversely impact any person who was injured or damaged by an occurrence before such cancellation."[75] Because the application of the law of other states, such as Oregon, could prevent parties injured in Washington from filing insurance claims, Washington's interests in protecting its citizens from pollution

---

[71] CP at 14714.

[72] CP at 14718.

[73] CP at 14718-19.

[74] CP at 14718-19. Pope & Talbot's operations in South Dakota and Canada together amounted to less than $1 million. CP at 14716-19. And its operations in Wisconsin caused approximately $5 million in damages. CP at 14716-19.

[75] Am. Cont'l Ins. Co. v. Steen, 151 Wn.2d 512, 522, 91 P.3d 864 (2004).

at Port Gamble are the "most deeply affected."[76] Taken together, Washington's interest in protecting the health and safety of its residents, the greater extent of the loss suffered in Washington, and the policy of the anti-annulment statute itself establishes that Washington has the most significant relationship to the settlement agreements.[77]

Thus, Washington law applies to Pope & Talbot's settlement agreements with Granite State, TIG, Evanston, and Wausau.

Agreements with choice of law provisions. Next, we turn to the agreements in which Pope & Talbot and certain Insurers contracted for a specific state's law to apply. Pope & Talbot's settlement agreements with Century, Westport, Continental, and Allstate all contain an Oregon choice of law clause.[78] Its agreement with London Market contains a California choice of law provision.[79] And its agreement with Munich contains a New Jersey choice of law provision.[80] For these six Insurers, our analysis also begins with the most significant relationship test.

---

[76] "The forum should seek to reach a result that will achieve the best possible accommodation of these policies. The forum should also appraise the relative interests of the states involved in the determination of the particular issue. In general, it is fitting that the state whose interests are most deeply affected should have its local law applied." RESTATEMENT (SECOND) CONFLICTS OF LAW § 6 cmt. f (1971).

[77] See Canron, 82 Wn. App. at 493.

[78] CP at 2800, 15524, 3168, 11731.

[79] CP at 5716.

[80] CP at 4818. In the alternative, London Market Companies and Munich argue that Oregon law should apply. But consistent with the section 188 analysis above, we do not find this argument compelling.

Specifically, Washington applies section 187 of the Restatement (Second) of Conflicts of Law when an actual conflict exists and the parties have contracted for a specific state's law to apply.[81]  Section 187 subsection (2) applies to particular issues that the parties could not have determined by explicit agreement, such as the validity of the agreement itself.[82]  Under section 187 subsection (2)(b), we will disregard the party's chosen state's law and "apply Washington law if, without the provision, Washington law would apply[,] if the chosen state's law violates a fundamental public policy of Washington[,] and if Washington's interest in the determination of the issue materially outweighs the chosen state's interest."[83]  All three questions must be answered in the affirmative to disregard the parties' chosen state's law.[84]

The first question in the 187 analysis, whether Washington law would apply if the contract did not contain a choice of law provision, must be answered using the same most significant relationship factors listed in section 188 and discussed above.  For these six Insurers, again, some factors favor them, some do not.  And, once again, the factors are inconclusive.

(1) Century.  Century representatives contracted for their settlement agreement from Pennsylvania with Pope & Talbot's president and

---

[81] Shanghai Com. Bank, 189 Wn.2d at 482; Erwin, 161 Wn.2d at 694.

[82] Erwin, 161 Wn.2d at 695.

[83] McKee v. AT&T Corp., 164 Wn.2d 372, 384, 191 P.3d 845 (2008) (citing id. at 694-95); see RESTATEMENT (SECOND) OF CONFLICTS OF LAW § 188(2)(b) (1971).

[84] Erwin, 161 Wn.2d at 696.

representatives located in Oregon.[85] During negotiations, Pope & Talbot's president and counsel were in Oregon, Century's representative was in Pennsylvania, and Century's counsel was in Washington.[86] Century signed the agreement in Pennsylvania, and Pope & Talbot signed the agreement in Oregon.[87] Century delivered its settlement check to Pope & Talbot in Oregon.[88] Pope & Talbot deposited the check in Oregon.[89] Pope & Talbot is a Delaware corporation headquartered in Oregon.[90] Century is a Pennsylvania corporation.[91] The agreement released Century from liability arising from Pope & Talbot's operations in Oregon and Washington.[92]

(2) Westport. Westport is a successor insurer to Employers Reinsurance Corporation.[93] Employers Reinsurance entered into the settlement agreement with Pope & Talbot.[94] Pope & Talbot's representatives and counsel in Oregon negotiated remotely with Employers Reinsurance's Kansas representative and its counsel in California and Oregon.[95] The agreement was signed by Pope &

---

[85] CP at 2749-50.

[86] CP at 2746, 2801-03.

[87] CP at 2801-03.

[88] CP at 2747.

[89] CP at 8816.

[90] CP at 8812.

[91] CP at 3610.

[92] CP at 2795-96, 9050-52.

[93] CP at 4835.

[94] CP at 4838.

[95] CP at 4838.

Talbot's president and Employers Reinsurance's claims specialist.[96]  Employers

Reinsurance was a Missouri corporation with its principle place of business in

Kansas.[97]  Pope & Talbot is incorporated in Delaware and is headquartered in

Oregon.[98]  The settlement agreement released Employers Reinsurance from

liability arising from Pope & Talbot's operations in Oregon, Canada, Wisconsin,

and Washington.[99]

(3) <u>Continental.</u>  Continental is an Illinois corporation.[100]  Continental's

Oregon counsel contracted for the settlement agreement with Pope & Talbot's

Oregon counsel.[101]  The attorneys, both located in Oregon, negotiated

telephonically and through the mail.[102]  Pope & Talbot's president and

Continental's claims counsel executed the agreement.[103]  Pope & Talbot signed

the agreement in Oregon.[104]  Continental delivered the settlement check to

Pope & Talbot in Oregon.[105]  And Pope & Talbot deposited the check in

---

[96] CP at 4868.  The record on appeal does not provide where Pope & Talbot and Westport representatives were located when contracting for their settlement agreement.  And the record also does not provide where the representatives were located when the settlement agreement was executed.

[97] CP at 4837.

[98] CP at 8812.

[99] CP at 4838.

[100] CP at 3101.

[101] CP at 2785, 3208-09.

[102] CP at 3099, 3208-09.

[103] CP at 3236.

[104] CP at 3099.

[105] CP at 14751.

Oregon.[106] Pope & Talbot is incorporated in Delaware and is headquartered in Oregon.[107] The agreement implicated Continental's liability arising from Pope & Talbot's operations in Canada.[108]

(4) Allstate. Allstate representatives contracted with Pope & Talbot for the settlement agreement from Illinois, Oregon, and California.[109] Pope & Talbot's representatives and counsel negotiated from Oregon, while Allstate's "claim analyst" and counsel negotiated from Illinois, California, and Oregon.[110] The "[n]egotiations took place in Portland and remotely by video conference and telephone between Portland, Oregon, California, and Illinois."[111] The agreement was signed by Allstate's representative in Illinois and by Pope & Talbot's representative in Oregon.[112] Allstate delivered the settlement check to Pope & Talbot in Oregon, and Pope & Talbot deposited the check in Oregon.[113] Allstate is headquartered in Illinois.[114] Pope & Talbot is incorporated in Delaware and is headquartered in Oregon.[115] The release discharged Allstate

---

[106] CP at 2784.

[107] CP at 8812.

[108] CP at 3170-72.

[109] CP at 3962.

[110] CP at 3962-63.

[111] CP at 3963.

[112] CP at 4652-53.

[113] CP at 3963.

[114] CP at 11793-94.

[115] CP at 8812.

from liability arising from Pope & Talbot's operations in Oregon, Canada, Wisconsin, and Washington.[116]

(5) London Market.  London Market representatives located in California contracted for the settlement agreement with Pope & Talbot representatives located in Oregon.[117]  Pope & Talbot's Oregon counsel and London Market's California counsel negotiated remotely, but some settlement negotiations occurred in person in London.[118]  Pope & Talbot signed the agreement in Oregon, and London Market's counsel signed the agreement in California.[119] London Market delivered the settlement check to Pope & Talbot in Oregon, and Pope & Talbot deposited the check in Oregon.[120]  London Market is an entity based in London.[121]  Pope & Talbot is incorporated in Delaware and is headquartered in Oregon.[122]  The settlement agreement released London Market from liability arising from Pope & Talbot's operations in Oregon, Canada, North Dakota, and Washington.[123]

(6) Munich.  Munich is a successor insurer to American Reinsurance Corporation.[124]  American Reinsurance Corporation entered into the settlement

---

[116] CP at 3962.

[117] CP at 2785, 9154.

[118] CP at 3324.

[119] CP at 5716-17.

[120] CP at 3326.

[121] CP at 14168.

[122] CP at 8812.

[123] CP at 5707-24, 9429-30.

[124] CP at 6046.

23

agreement with Pope & Talbot.[125] American Reinsurance's New Jersey counsel contracted for the settlement agreement with Pope & Talbot's Oregon counsel.[126] Negotiations occurred remotely between American Reinsurance representatives in New Jersey, its counsel in Chicago, and Pope & Talbot representatives and counsel in Oregon.[127] The settlement discussions consisted of written communications between Pope & Talbot's Oregon counsel and American Reinsurance's claims representative in New Jersey and its Chicago counsel.[128] American Reinsurance representatives signed the agreement in New Jersey, and Pope & Talbot's president signed the agreement in Oregon.[129] American Reinsurance and Pope & Talbot are incorporated in Delaware.[130] American Reinsurance's headquarters are in New Jersey, and Pope & Talbot's headquarters are in Oregon.[131] The settlement agreement discharged American Reinsurance from liability arising from Pope & Talbot's operations of sites in Oregon and Washington.[132]

---

[125] CP at 6048.

[126] CP at 2785, 4793, 12567-68.

[127] CP at 4793.

[128] CP at 6048.

[129] CP at 4819-20.

[130] CP at 4794.

[131] CP at 4794.

[132] CP at 9050-52.

Again, the negotiations leading up to the settlement agreements were held in multiple states, and the only consistent contacts occurred in Oregon and Washington.

As discussed above, the section 188 factors must be evaluated in the context of section 6 policy considerations. Accordingly, Washington's interests in protecting its residents from environmental contamination, its interests in cleaning up the severe contamination that occurred in Washington, and its interests in adhering to the policy behind RCW 48.18.320 displaces the much less significant relationships that these settlement agreements have with Oregon, California, and New Jersey.

The next question in the section 187 analysis is whether the laws of Oregon, California, and New Jersey violate a fundamental public policy of Washington. In answering this question, we return to the policy of RCW 48.18.320. Because the application of Oregon, California, and New Jersey law could prevent injured parties from filing insurance claims for environmental claims involving Port Gamble, each of the chosen states' laws violates Washington's fundamental public policy preferences.

The last question in the section 187 analysis is whether Washington's interests materially outweigh the interests of Oregon, California, and New Jersey. Consistent with the section 188 and section 6 analyses above, taken together, Washington's "paramount interest" in protecting the health and safety of its residents, the sheer volume of contamination and resulting cost of remediation in Washington, and the policy behind Washington's anti-annulment

statute materially outweighs the individual interests of Oregon, California, or New Jersey. Because each question prescribed by section 187 favors the application of Washington law, Washington law also applies to Pope & Talbot's settlement agreements with Century, Westport, Continental, Allstate, London Market, and Munich.

We conclude that Washington law applies to all ten settlement and remediation agreements.

Pope Resources, citing Freestone Capital Partners L.P. v. MKA Real Estate Opportunity Fund I, LLC,[133] argues that section 187 has no application because it is not a party to the settlement agreements. But Freestone held that the guarantors were not bound by choice of law provisions contained solely in the promissory note because promissory notes and guarantees create separate obligations for differently situated parties.[134]

Here, however, Pope Resource's interest in the insurance policies is based upon its potential role as a judgment creditor of Pope & Talbot, entitled to garnish the benefits of Pope & Talbot's policies. Because Pope Resources seeks to "stand in the shoes" of Pope & Talbot and benefit from the agreements between Pope & Talbot and Insurers, Pope Resources' argument is unavailing.

II. RCW 48.18.320

Because Washington law applies to each settlement agreement, we next consider whether the ten agreements violate Washington's anti-annulment

---

[133] 155 Wn. App. 643, 661-62, 230 P.3d 625 (2010).

[134] Id.

statute, RCW 48.18.320, which voids any agreement between an insurer and insured attempting to retroactively cancel, rescind, void, buy back, or otherwise annul an insurance contract for liability coverage after a potentially covered injury or damage to a third party has occurred.[135]

"'To determine legislative intent, we look first to the language of the statute.'"[136] "'If a statute is unambiguous, we may derive its meaning from the language of the statute alone.'"[137] The statute provides:

> No insurance contract insuring against loss or damage through legal liability . . . for damage to the property of any person, shall be retroactively annulled by any agreement between the insurer and insured after the occurrence of any such . . . damage for which the insured may be liable, and any such annulment attempted shall be void.[138]

The statute "is broad and inclusive."[139]

To analyze whether RCW 48.18.320 is ambiguous, we consider in turn each requirement of the statute.[140]

An "annulment" subject to the statute can take the form of attempts to abrogate, abolish, buy back, cancel, nullify, rescind, or void an insurance

---

[135] Steen,151 Wn.2d at 521.

[136] Bremerton Pub. Safety Ass'n v. City of Bremerton, 104 Wn. App. 226, 230, 15 P.3d 688 (2001) (citing Lacey Nursing Ctr., Inc. v. Dep't of Revenue, 128 Wn.2d 40, 53, 905 P.2d 338 (1995)).

[137] Id. (citing Cherry v. Mun. of Metro. Seattle, 116 Wn.2d 794, 799, 808 P.2d 746 (1991)).

[138] RCW 48.18.320.

[139] Steen, 151 Wn.2d at 519.

[140] See id. at 518-25.

contract.[141]  Insurers often desire to "buy-back" liability insurance as part of

settlement agreements with their insureds.[142]  But neither a cancellation,

rescission, "buy back," nor other form of annulment is enforceable to defeat an

injured third party's vested rights.[143]

"Retroactively" as is used in the statute means "while looking back or

affecting things past" and extends to either prospectively cancelling an

agreement or rescinding it ab initio.[144]

An "occurrence" for purposes of the statute extends "both [to] events that

do give rise to legal liability covered by the [insurance] policy and [to] events

---

[141] Id. at 520.

[142] RICHARD A. ROSEN, LIZA M. VELAZQUEZ, GITA. F. ROTHSCHILD & STACI JANKIELEWICZ, SETTLEMENT AGREEMENTS IN COM. DISPUTES: NEGOTIATING, DRAFTING AND ENFORCEMENT, § 19.10 (2d ed. 2021) ("The broadest release—and consequently the one most desired by insurers—is the 'policy buy-back.' Put simply, policies subject to a complete buy back are void ab initio.  An insurer's defense and indemnity obligations for any and all past, present, and future claims of any type under the released policies are released.").

[143] STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS, & JORDAN R. PLITT, 2 COUCH ON INSURANCE 3D § 31:49 (1995) ("A completed surrender and cancellation of an insurance policy terminates the contract, and the parties are relieved from any liability that might otherwise accrue under the policy, though not from liability already accrued."); 8B JOHN A. APPLEMAN & JEAN APPLEMAN, INSURANCE LAW & PRACTICE § 5020 (1981) ("[I]t is the general rule that an injured person's rights cannot be defeated by a cancellation or settlement after an accident has occurred."); see SCOTT M. SEAMAN & JASON R. SCHULZE, ALLOCATION OF LOSSES IN COMPLEX INSURANCE COVERAGE CLAIMS § 15:1 (2020-21 ed.) ("Additionally, even a policy buy-back or mutual rescission agreement with complete releases of all known and unknown claims does not guarantee finality.  For example, an insurer may not be able to enforce a policy buy-back agreement against vested third-party rights such as those of underlying claimants whose claims have accrued and are not parties to the agreement.").

[144] Steen, 151 Wn.2d at 521 (quoting RCW 48.18.320).

that could give rise to legal liability covered by the [insurance] policy."[145]  But

"[t]he statute does not void agreements that are made <u>before</u> the occurrence of

any injury, death or damage for which the insured may be liable [but renders an

agreement] ineffectual when the agreement is made <u>after</u> the occurrence of the

potentially covered event."[146]

An agreement is "'a manifestation of mutual assent by two or more

persons to one another.'"[147]  Thus, the phrase "any agreement" as used in the

statute clearly extends to a settlement agreement between an insurer and an

insured.[148]

Insurers contend that the various settlement agreements and releases

do not impact an "insurance contract" as referred to in the statute because only

an "insurance policy" is an "insurance contract."[149]  We disagree.  The statute

does not define "insurance contract."  The basic meanings of "contract" and

"insurance" are a starting point, but it is also helpful to consider our case law

regarding what constitutes a "contract of insurance."

---

[145] Id.

[146] Id. at 521.

[147] Corbit v. J. I. Case Co., 70 Wn.2d 522, 531, 424 P.2d 290 (1967)
(quoting RESTATEMENT (FIRST) OF CONTRACTS § 3 (1932)).

[148] See Courville v. Lamorak Ins. Co., 301 So. 3d 557, 560 (La. Ct. App.
2020) (applying an anti-annulment statute identical to RCW 48.18.320 to void a
settlement agreement that "essentially rescinded or annulled policy contracts for
injuries sustained years ago" by a third party tort victim).

[149] Appellant's Opening Br. at 54-58.

"A contract is a legally enforceable promise or set of promises."[150] "Insurance" is broadly defined as "a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies."[151] To be a contract of insurance, the agreement must be both a risk-shifting and risk-distributing device. "A contract may be a risk-shifting device, but to be a contract of insurance, which is a risk-distributing device, it must possess both features, and unless it does[,] it is not a contract of insurance whatever be its name or its form."[152] Similarly, "[w]hen deciding whether a law applies to a contract, we are 'guided by the substance or effect of the transaction rather than the particular form or label adopted.'"[153]

The Washington State Insurance Commissioner, an amicus, convincingly argues that "insurance" may take many forms, and the term "insurance contract" applies to a general and broad category of contracts that are both risk-shifting and risk-distributing devices.[154] Although most insurance comes in the

---

[150] 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 301.01, at 163 (7th ed. 2019). "A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." RESTATEMENT (SECOND) OF CONTRACTS § 1 (1971).

[151] RCW 48.01.040.

[152] In re Smiley's Estate, 35 Wn.2d 863, 867, 216 P.2d 212 (1950) (emphasis added).

[153] Ten Bridges, LLC v. Guandai, 15 Wn. App. 2d 223, 237, 474 P.3d 1060 (2020) (quoting id. at 866, 216 P.2d 212 (1950)).

[154] Wash. Court of Appeals oral argument, Granite State Ins. Co. v. Pope Resources, No. 80032-9-I, (Apr. 21, 2021), at 53 min., 18 sec. through 55 min., 54 sec., video recording by TVW, Washington State's Public Affairs Network, https://www.tvw.org.

form of a written "policy," there are a variety of contracts that may satisfy the definition of "insurance" without resembling a traditional "policy."[155]  Additionally, the more specific term "insurance policy" has a limited and precise meaning. For example, insurance policy forms must be filed with and approved by the insurance commissioner.[156]  And the insurance commissioner has authority to define various standard form policies.[157]  Stated another way, an "insurance policy" qualifies as one form of "insurance contract,"[158] but that does not mean only a document labeled "policy" constitutes an "insurance contract."

Therefore, we read the term "insurance contract" in RCW 48.18.320 broadly and flexibly, applying it based upon the true substance of each settlement agreement and release rather than any particular form or label.[159]  Specifically, we consider whether the substance of the settlement agreement

---

[155] See STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS & JORDAN R. PLITT, 1 COUCH ON INSURANCE 3D § 1:12 (2009) (some forms of performance bonds, guaranty agreements, surety agreements, and other miscellaneous contracts may satisfy the definition of "insurance").

[156] RCW 48.18.100.

[157] RCW 48.18.120.

[158] See Steen, 151 Wn.2d at 521 (applying RCW 48.18.320 to an insurance policy); see also Strojnik v. General Ins. Co. of Am., 201 Ariz. 430, 435, 36 P.3d 1200 (Ariz. Ct. App. 2001) ("Although the legislature has not defined an 'insurance contract,' it has defined 'insurance' as 'a contract by which one undertakes to indemnify another or to pay a specified amount upon determinable contingencies.' A.R.S. § 20-1123 (A).  An insurance policy, therefore, is an 'insurance contract.'") (construing Arizona's anti-annulment statute, which is identical to RCW 48.18.320).

[159] In a related sense, a contract of insurance itself is a promise or set of promises, rather than a written memorialization labeled as a "policy."  See RCW 48.18.140 (distinguishing between written instrument and contract).

31

and release impacts a risk-shifting and risk-distributing device. As the Supreme

Court explained in American Continental Insurance Company v. Steen:

> [T]he legislative intent expressed in RCW 48.18.320 is to ensure
> that cancellation does not adversely impact any person who was
> injured or damaged by an occurrence before such cancellation. . . .
>
>      . . . .
>
>     The purpose of RCW 48.18.320 is not the protection of
> either the insured or the insurer. Its purpose is to protect the
> injured and damaged by preventing insureds and insurers from
> coming together and canceling or rescinding insurance contracts
> after a potentially covered injury, death, or damage has
> occurred.[160]

Focusing on the substance instead of the form of the parties' settlement

agreements and releases better implements the intent of RCW 48.18.320.

Therefore, our review of the plain meaning of the anti-annulment statute

confirms its broad application. A cancellation, rescission, buy back, or other

annulment of an insurance contract by mutual agreement is a contract formed

like any other contract and requires mutual assent.[161] "Washington follows the

objective manifestation test for contract formation."[162] And, notably,

RCW 48.18.320 expressly refers to annulments "attempted." Consistent with

Steen, we conclude RCW 48.18.320 is not ambiguous and extends to any

---

[160] 151 Wn.2d 512, 522, 91 P.3d 864 (2004).

[161] STEVEN PLITT, DANIEL MALDONADO, JOSHUA D. ROGERS & JORDAN R. PLITT, 2 COUCH ON INSURANCE 3D § 31:58 (2009).

[162] Wilson Court Ltd. P'ship v. Tony Maroni's, Inc., 134 Wn.2d 692, 699, 952 P.2d 590 (1998) ("Washington follows an objective manifestation test for contracts, looking to the objective acts or manifestations of the parties rather than the unexpressed subjective intent of any party." (citations omitted)).

attempt to cancel, rescind, void, buy back, or otherwise annul a contractual obligation that in substance is a risk-shifting and risk-distributing device manifesting a mutual intent to insure against liability resulting from triggering events occurring before a settlement agreement and release was entered into.[163]

Over many decades, the Port Gamble mill released toxic substances, including wood debris sedimentation, that triggered environmental insurance claims and implicated Pope & Talbot's "long tail" environmental coverage provided by Insurers.[164] Here, each of the ten settlement agreements contain broad release provisions and specific language attempting to cancel, rescind, void, buy back or otherwise annul liability coverage for injury or damage that occurred prior to the agreement.

Pope & Talbot's settlement agreements with TIG, Evanston, Westport, London Market, Munich, Century, and Wausau all contain language objectively manifesting an intent to cancel, rescind, void, buy back, or otherwise annul their broadly defined "policy" or "policies" issued to Pope & Talbot.

TIG. TIG's settlement agreement provides, "In further consideration of the covenants contained in this Agreement, the parties hereto agree that the

---

[163] Steen, 151 Wn.2d at 522.

[164] CP at 2527, 7100. "The term 'long-tail harms' describes a series of indivisible harms, whether bodily injury or property damage, that are attributable to continuous or repeated exposure to the same or similar substances or conditions that take place over multiple years or that have a long latency period. The paradigmatic examples of long-tail harms are asbestos-related bodily injuries and environmental property damage." RESTATEMENT (SECOND) OF LIABILITY INSURANCE § 33 cmt. f (2019); see Appellant's Opening Br. at 56.

Policies shall be rescinded, treated as null and void ab initio, and considered never to have been issued to Pope & Talbot by International."[165] "Policies" is defined to broadly include any and all policies TIG issued to Pope & Talbot.[166]

Evanston. Evanston's agreement states it is "a final settlement . . .with the Policy void ab initio."[167] "Policy" is defined to include any liability policy issued to Pope & Talbot.[168]

Westport. Westport's agreement refers to a "complete policyholder release and a cancellation of the Policy."[169] "The Policy" is defined as one specific named policy.[170]

London Market. London Market's agreement provides, "This Release is intended to operate as though the London Market Insurers which pay their allocated several share of the settlement amount had never subscribed to the Subject Insurance Policies."[171] "Subject Insurance Policies" is defined as "all known and unknown insurance policies incepting prior to January 1, 1993."[172]

---

[165] CP at 3005.

[166] CP at 3004.

[167] CP at 3063.

[168] CP at 3061.

[169] CP at 4866.

[170] CP at 4865.

[171] CP at 5711.

[172] CP at 5709.

Munich.  Munich's agreement acknowledges "that all Policies have been bought back . . . as of the inception date thereof and cancelled."[173]  "Policies" is defined as all "actual or alleged" policies issued to Pope & Talbot.[174]

Century.  Century's agreement states the settlement "constitutes a complete and unqualified policy release for insurance coverage."[175]  The policies are defined as "any and all known or unknown policies" issued by Century to Pope & Talbot.[176]

Wausau.  The Wausau agreement acknowledges that the parties "have agreed to a buy-back of the Policies, retroactively effective as of their inception dates."[177]  The "Policies" refers to fifteen separate policies issued by Wausau to Pope & Talbot.[178]

For each of these seven settlement agreements, Pope & Talbot and the named insurer objectively manifested their mutual intent to cancel, rescind, void, buy back, or otherwise annul the entirety of liability policies issued to Pope & Talbot.  Such attempts are subject to RCW 48.18.320.  Because the agreements purport to accomplish exactly what the statute precludes—"insured and insurers . . . coming together and canceling or rescinding insurance

---

[173] CP at 4816.
[174] CP at 4815.
[175] CP at 2795.
[176] CP at 2794.
[177] CP at 3774.
[178] CP at 3782.

contracts after a potentially covered injury, death, or damage has occurred"—these attempts violate the anti-annulment statute.[179]

Pope & Talbot's settlement agreements with Allstate, Continental, and Granite State also violate RCW 48.18.320 because the substance of these three agreements manifest the mutual intent to cancel, rescind, void, buy back, or otherwise annul an insurance contract issued to Pope & Talbot.

Allstate.  Allstate's settlement agreement provides, "[Pope & Talbot] hereby forever fully and irrevocably releases, acquits, and discharges Allstate, of and from any liability or obligations, or alleged or potential liability, or obligation of whatever kind, nature or description, known or unknown."[180]  The agreement states the parties "desire to completely extinguish and terminate any and all contractual and insurance relationships."[181]

Allstate focuses upon the specific release provision contained in its agreement with Pope & Talbot to argue that their release is a "site-specific, not a global release of the Policies and applies only to claims against Pope & Talbot that it has asserted or in the future could assert obligate Allstate to provide Pope & Talbot with coverage under The Policies for the Sites as defined herein."[182]  "The Policies" include "any and all policies of insurance of

---

[179] Steen, 151 Wn.2d at 524.

[180] CP at 4640.

[181] CP at 4633.

[182] CP at 11722.

any kind whatsoever" issued by Allstate to Pope & Talbot.[183]  "Sites" is defined to include property owned or operated by Pope & Talbot in St. Helens, Oregon, Port Ludlow, Washington, Port Gamble, Washington, Ladysmith, Wisconsin, and Castlegar, British Columbia.[184]  Notwithstanding the "not a global release" language, the broad recital of intent to extinguish and terminate any insurance relationship cannot be ignored.[185]  The objective manifestation of intent to completely terminate any insurance relationship is an attempt to cancel or rescind every policy issued by Allstate.[186]  The anti-annulment statute applies.

Continental.  Continental's settlement agreement provides, "The settling carriers have no further obligations to Pope and Talbot whatsoever under any policy of insurance except as expressly reserved herein."[187]  The settlement agreement broadly provides for the release of all environmental claims "except only [those] relating to the [British Columbia] Sites and the St. Helens Site."[188]

---

[183] CP at 11719.

[184] CP at 11716.

[185] See, e.g., Hawkins v. Empres Healthcare Mgmt., LLC, 193 Wn. App 84, 96, 371 P.3d 84 (2016) ("In Washington, special recitals accompanying a release of "all claims" limit the scope of the release." (citing Fradkin v. Northshore Util. Dist., 96 Wn. App. 118, 128, 977 P.2d 1265 (1999))).

[186] Allstate also contends that all of its insurance policies with Pope & Talbot had expired prior to entering into the settlement agreement and thus, the policies were no longer operational.  Appellant Allstate's Br. at 17-18.  But given the nature of long tail environmental coverage, the underlying policy remains effective as to environmental claims.

[187] CP at 3231.

[188] CP at 3231.

To the extent Continental argues it has ongoing coverage, we are not convinced.

Specifically, the agreement provides, "With respect to the [British Columbia] Sites only, this Agreement shall release and forever discharge the Settling Carriers from any and all alleged obligations under the Excess Policies . . . but not under any primary policy issued by the Settling Carriers."[189] However, there is no evidence of any primary policies. Continental advised the trial court that it "issued two policies to [Pope & Talbot] in Oregon, with policy periods between 1967 and 1970 and between 1974 and 1977."[190] The two policies were excess or "excess-umbrella" coverage.[191]

Neither of those Continental policies were primary policies. Continental did not identify any primary policy issued to Pope & Talbot. There is nothing in the record before us confirming or even suggesting that Continental ever issued Pope & Talbot a primary insurance policy, and Continental makes no assertion that it ever issued such a policy.[192] On this record, the reservation for British

---

[189] CP at 3231 (emphasis omitted).

[190] CP at 3098; see also CP at 3144-48, 10706-08.

[191] CP at 3099, 3145 ("Excess Umbrella Liability"), 3150 ("Excess Umbrella Policy"). Continental "may have issued a third policy to Pope & Talbot in Oregon for a policy period between 1973 and 1976." CP at 3098. The third policy, an "Excess Third Party Liability Policy" appears to have been cancelled and rewritten as part of an "Umbrella Liability Renewal [on] January 1, 1974." CP at 3098-99, 3156.

[192] The settlement agreement defines "The Excess Policies" as two specific policies. CP at 3229. And recitations to the settlement agreement merely state "Pope & Talbot alleges that the Settling Carriers sold comprehensive liability insurance to Pope & Talbot . . . including, but not limited to, the Excess Policies." CP at 3230. The recitals also include Continental's

Columbia sites for any "primary policy issued by the Settling Carriers"[193] is insignificant. For purposes of RCW 48.18.320, the 'buy back' of all insurance other than primary coverage of the British Columbia sites is, in substance, a cancellation of the only documented Continental policies issued by Continental or known to Pope & Talbot. The reservation as to primary coverage for British Columbia sites does not create a safe harbor for Continental.

As to the St. Helens site, the agreement expressly stated that "Pope & Talbot's claims relating to the St. Helens site were resolved by a separate agreement relating to that site, executed prior to this Agreement."[194] The resolution of the St. Helens site claims by means of a separate settlement agreement does not support the existence of any ongoing Continental liability coverage of the St. Helens site claims.[195] This reservation is also insignificant.

For purposes of RCW 48.18.320, in substance, the only Continental insurance coverage was completely eliminated by the settlement agreement. The anti-annulment statute applies.

Granite State. Granite State's 2001 settlement agreement provides, "[T]he Policies shall be considered null and void ab initio, of no further force and

---

representation that it "has searched its record for excess or umbrella policies" and has not found information or records "of such other policies and has no knowledge that such other policies may have been issued to Pope & Talbot." CP at 3230. There are no representations about any search for or knowledge of any primary policy.

[193] CP at 3231.

[194] CP at 3216, 3231.

[195] See CP at 3221.

effect with respect to any Environmental Claims released hereunder."[196] Such

a provision is commonly called an environmental buyout.[197] The release of

"environmental claims" was limited to "St. Helens, Oregon, Port Gamble,

Washington, the latter including, but not limited to, wood debris sedimentation in

Port Gamble Bay, and the upland portion of Port Ludlow, Washington."[198]

Granite State argues that RCW 48.18.320 is limited to cancellation of an

entire insurance policy. In its agreement with Pope & Talbot, Granite State

provided, "[T]his Release does not apply to Port Ludlow Bay . . . or any sites not

expressly included in this Release."[199] Granite State contends that its policies

continued to apply after the 2001 settlement agreement both to environmental

claims at other sites and to nonenvironmental claims at any site.[200] But the

"broad and inclusive" anti-annulment statute is not so limited.

Steen factually involved the cancellation of an entire insurance policy,

but our Supreme Court did not hold that only entire insurance policies qualify as

"insurance contracts" for purposes of RCW 48.18.320.[201] In addition, Steen

included multiple references to "insurance coverage" and to "insurance

---

[196] CP at 2538.

[197] See Steven Plitt, Policy Buyback Limitations (July 29, 2021), https://www.insuranceexpertplitt.com/blog/2021/07/policy-buyback-limitations/.

[198] CP at 2538.

[199] CP at 2539.

[200] See CP at 13057.

[201] Steen, 151 Wn.2d at 521-23.

contracts" when discussing the application of the statute.[202] Nothing in Steen prohibits a broad and inclusive interpretation of the anti-annulment statute. Indeed, the court interpreted the statute as applicable to "all insurance contracts" and prohibiting "agreements retroactively annulling insurance coverage."[203]

And, as discussed, we must consider the nature and substance of the Granite State insurance in the context of its settlement agreement. From 1968 to 1985, Granite State issued eleven insurance policies to Pope & Talbot, including eight umbrella policies.[204] The most recent term of Granite State insurance was fifteen years prior to its 2001 settlement agreement.[205] The original focus of the litigation involving Granite State was environmental claims arising from sites operated by Pope & Talbot in Oregon and Washington.[206] The record before us does not suggest that when the 2001 settlement agreement was entered into there were any existing occurrences causing damage to third parties other than environmental events. At the time of the 2001 settlement, the substance of Granite State's coverage was limited to such

---

[202] See, e.g., id. at 521-24 ("cancels or rescinds ab initio an insurance contract," "for which the insurance contract provides coverage," "agreements retroactively annulling insurance coverage are prohibited and void," "retroactively annul coverage of that event," "did not intend to prohibit the cancellation of insurance contracts," "canceling or rescinding of insurance contracts") (emphasis added).

[203] Id. at 518-19, 521.

[204] CP at 2765-66, 10815-54.

[205] CP at 6822, 10851-52.

[206] CP at 2765-66, 10814-54.

long tail environmental claims.  Under these particular circumstances, such risk sharing and risk distributing coverage qualifies as an insurance contract.

Further, in this context, the agreement between Pope & Talbot and Granite State terminated Granite State's coverage of environmental claims by providing that the agreement rendered the insurance coverage void ab initio, frustrating the fundamental purpose of RCW 48.18.320.  Allowing the buyout of all potential long tail environmental claims as of 2001, even when limited to the Port Gamble, St. Helens, and the upland portion of Port Ludlow sites, leaves third parties damaged by the pre-2001 environmental occurrences without access to that coverage.  And the possibility that there may be hypothetical environmental claims as to other sites does not bar the application of RCW 48.18.320.  Voiding the coverage of substantial long tail environmental claims at major contaminated sites adversely impacts those injured or damaged by environmental occurrences before the 2001 settlement agreement.  The anti-annulment statute applies.

Because in operation all ten settlement agreements were attempts to cancel, rescind, void, or buy back liability insurance coverages in violation of RCW 48.18.320, we conclude that each of the ten settlement agreements between Pope & Talbot and its insurers is unenforceable.

Insurers' remaining arguments regarding RCW 48.18.320 are not persuasive.  First, Insurers contend that the arms-length settlement of known or potential environmental claims against Pope & Talbot, for which Pope & Talbot received much more than a partial or complete return of premiums, is not

subject to RCW 48.18.320. But the inclusion of express and specific provisions that purport to cancel, rescind, void, buy back or otherwise annul liability coverage for past occurrences went far beyond a release of known or potential claims, thus triggering RCW 48.18.320. The attempted annulment of liability coverage arising out of past environmental occurrences is prohibited by the statute.

Contrary to Insurers' arguments, the public policy favoring settlement does not outweigh the strong public policy of RCW 48.18.320 to preclude adversely impacting those injured or damaged by environmental occurrences before the settlement agreements were entered into.[207]

Insurers argue the use of broad releases including voiding or buying back past insurance coverage is legitimate. Insurers are not precluded from agreeing with insureds to cancel liability coverage so long as such cancelation is limited to claims for damage or injury resulting from occurrences after the agreement.[208] Although Insurers may have preferred Pope & Talbot's broad release of known or potential claims together with an agreement cancelling, rescinding, voiding, buying back or otherwise annulling liability coverages, RCW 48.18.320 bars an attempt to defeat vested third party claims for loss or damage occurring before the agreement.

---

[207] Steen, 151 Wn.2d at 522.

[208] Id. ("The statute does not void agreements that are made before the occurrence of any injury, death, or damage for which the insured may be liable.").

To the extent Insurers contend that the application of RCW 48.18.320 adversely impacts the practicality of long tail environmental claim settlements, they fail to establish that public policy warrants the insureds and Pope & Talbot stranding injured third parties with vested rights solely because they have long tail environmental claims. We are not convinced by Insurers' prediction of the death of long tail environmental claim settlements.

Insurers also contend Pope Resources lacks standing because it is not a party to the settlement agreements, but an injured third party may pursue the issuer of a liability policy by means of garnishment of the policy once a judgment is obtained against the insured. As a potential judgment creditor, Pope Resources' zone of interest extends to the possible garnishment of the liability insurance policies.[209] The extent of Pope Resources' actual and bona fide injury and damage, as well as questions of agency and alter ego, are more properly addressed in the trial court in the remaining phases of this litigation.

Insurers further argue that as to Pope Resources, any portions of their settlement agreements providing for cancellation, rescission or buy back of

---

[209] In re Custody of S.R., 183 Wn. App. 803, 809, 334 P.3d 1190 (2014) (to establish that an injured party is within the zone of interests, "'[t]he litigant must have suffered an "injury in fact," thus giving him or her a "sufficiently concrete interest" in the outcome of the issue in dispute; the litigant must have a close relation to the third party; and there must exist some hindrance to the third party's ability to protect his or her own interests'" (quoting Powers v. Ohio, 499 U.S. 400, 411, 111 S. Ct. 1364, 113 L. Ed.2d 411 (1991))); Burr v. Lane, 10 Wn. App. 661, 670, 517 P.2d 988 (1974) ("the injured party, after recovering judgment against the insured, may recover under the policy to the extent of the insurance afforded by this policy. He may recover by the means of a writ of garnishment") (internal quotation marks omitted).

liability insurance are severable either under express severability provisions or under common law. We disagree.

Insurers cite to <u>Zurich v. Airtouch Communications, Inc.,</u>[210] to support their contention that the severability provisions in the settlement agreements with Continental, Evanston, TIG, Wausau, and Allstate are enforceable. But in <u>Zurich</u>, our Supreme Court narrowly held that "when parties have agreed to a severability clause in an arbitration agreement, courts often strike the offending unconscionable provisions to preserve the contract's essential term of arbitration."[211] <u>Zurich</u> is not applicable where, as here, the contracts' essential terms are prohibited by statute and were prohibited when the contracts were formed.

The remaining five settlement agreements, London Market, Century, Munich, Westport, and Granite State, do not contain severability provisions, but those insurers contend that their agreements are "still severable" under section 208 of <u>Restatement (Second) of Contracts.</u>[212] Section 208 governs an unconscionable contract or term and applies where "a contract or term thereof is unconscionable at the time the contract is made."[213] Insurers argue that "the settlements can be enforced against [Pope Resources] as settlements of [Pope & Talbot's] insurance claim regarding [Pope Resources'] claim against [Pope &

---

[210] 153 Wn.2d 293, 103 P.3d 753 (2004).

[211] <u>Id.</u> at 320.

[212] Appellants' Opening Br. at 64.

[213] RESTATEMENT (SECOND) OF CONTRACTS § 208 (1979).

Talbot]."[214]  But Insurers provide no compelling authority in support of their proposition that an agreement rendered unenforceable by RCW 48.18.320 can still be severable, with the remainder of the settlement enforceable under section 208.[215]

Insurers next argue that the release provisions of the settlement agreements are an accord and satisfaction and therefore do not constitute an agreement subject to the statute.[216]  But an accord and satisfaction is an agreement.[217]  The express language contained in the agreements and releases here, cancelling, rescinding, voiding, buying back, or otherwise annulling liability coverage, is just as effective as if set out in a separate cancellation, rescission, buy back or other annulment agreement.

Further, Insurers argue that it would be unconstitutional under the full faith and credit clause of article IV of the United States Constitution and the due

---

[214] Appellants' Opening Br. at 65.

[215] Alternatively, Insurers cite Saletic v. Stamnes, 51 Wn.2d 696, 321 P.2d 547 (1958), in support of severability.  In Saletic, our Supreme Court stated, "'Whether a contract is divisible depends very largely on its terms and on the intention of the parties disclosed by its terms.  As a general rule[,] a contract is entire when by its terms, nature, and purpose, it contemplates and intends that each and all of its parts are interdependent and common to one another and the consideration.'" (quoting Traiman v. Rappaport, 41 F.2d 336, 338, 71 A.L.R. 475 (3d Cir. 1930)).  But "any agreement" that violates RCW 48.18.320 is unenforceable.  RCW 48.18.320 does not contemplate severability.

[216] Appellant's Reply Br. at 56-57.

[217] 27 MARJORIE DICK ROMBAUER, WASHINGTON PRACTICE: CREDITORS' REMEDIES—DEBTORS' RELIEF § 5.63, at 532 (1998) ("An accord and satisfaction is a contract between a creditor and a debtor that compromises a doubtful or disputed claim and substitutes a new performance for the original claim with the intention of discharging the original claim.").

process clause of the Fourteenth Amendment to invalidate the release agreements based upon RCW 48.18.320. Insurers contend that in determining whether the release agreements are "fair," the most important consideration is the intention of the parties.[218] Alleging they did not anticipate that Washington law would apply, Insurers argue that invalidating the settlement agreements based upon RCW 48.18.320 would be unconstitutional.

But the due process and full faith and credit clauses prohibit certain choice of law decisions only when the choice of law is arbitrary or fundamentally unfair, such as when "the selection of forum law rested exclusively on the presence of one nonsignificant forum contact."[219] In Phillips Petroleum Company v. Shutts, for example, the Court held the Kansas Supreme Court violated the Constitution by applying Kansas law to members of a nationwide class who had no connections to Kansas other than their coincidental membership in a nationwide class action filed in Kansas.[220] Because here, it is not arbitrary or fundamentally unfair to apply the anti-annulment statute, their argument is not compelling.

Finally, some Insurers argue that because Pope Resources "encouraged and benefited from" the settlement agreements it seeks to invalidate, Pope Resources is not an innocent third party.[221] But in Steen, our Supreme Court

---

[218] Appellants' Opening Br. at 64.

[219] Allstate Ins. Co. v. Hague, 449 U.S. 302, 308-09, 101 S. Ct. 633, 66 L. Ed. 2d 521 (1981).

[220] 472 U.S. 797, 822-23, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985).

[221] Appellants Evanston and TIG Br. at 1.

stated that the purpose of RCW 48.18.320 "is to protect the injured and damaged by preventing insureds and insurers from coming together and canceling or rescinding insurance contracts."[222]  RCW 48.18.320 does not require that the injured third party be oblivious to the annulment agreement between the insurers and insured.  We note it is possible that Pope Resources' particular role in the events leading up to the settlement agreements may arise in the remaining phases of this litigation.

We affirm the trial court's conclusion that the ten settlement and remediation agreements are void under Washington's anti-annulment statute.

_____

WE CONCUR:

_____     _____

---

[222] Steen, 151 Wn.2d at 524.